STATE OF NEBRASKA, APPELLEE, V. RICKY J. COSTANZO, APPELLANT.
419 N.W.2d 156

Filed February 12, 1988.   No. 87-254.

John Stevens Berry and Robert B. Creager of Berry, Anderson, Creager & Wittstruck, P.C., for appellant.

Robert M. Spire, Attorney General, and Yvonne E. Gates, for appellee.

HASTINGS, C.J., WHITE, SHANAHAN, and FAHRNBRUCH, JJ., and HANNON, D.J.

FAHRNBRUCH, J.

The defendant, Ricky J. Costanzo, was found guilty of assault in the first degree by a Douglas County District Court jury. The defendant appeals his conviction and indeterminate sentence of 5 to 10 years' imprisonment. We affirm.

Neb. Rev. Stat. § 28-308 (Reissue 1985) provides that a person who intentionally or knowingly causes serious bodily injury to another person is guilty of assault in the first degree. In this case, Costanzo delivered a single blow to the left jaw of Edward McCarthy, which knocked McCarthy to the sidewalk. The victim suffered brain damage, a broken jaw in two places, and other injuries.

Summarized, defendant's assigned errors are (1) insufficiency of the evidence for conviction; (2) error in instruction No. 10 as given, failure to give defendant's proposed instruction, and failure to sua sponte give a lesser-included offense instruction; (3) ineffective assistance of counsel; and (4)

imposition of an excessive sentence. The assignments of error will be discussed in order, keeping in mind that "[a] jury verdict of guilty will not be overturned on appeal unless it is based on evidence so lacking in probative force that it can be said as a matter of law that the evidence is insufficient to support the verdict." *State v. Dwyer*, 226 Neb. 340, 344, 411 N.W.2d 341, 344 (1987); and that

> in determining the sufficiency of the evidence to sustain a criminal conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the finder of fact, whose findings must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support them.

*State v. Newson*, 226 Neb. 867, 870, 415 N.W.2d 471, 473 (1987).

There was evidence that the victim, Edward McCarthy, was picked up at his home in Omaha by a friend, William Driscoll, at approximately 5 p.m., July 12, 1986. The pair drank some beer at the victim's home and then, at a club, had dinner without any alcoholic drinks. After that, with Driscoll driving, the pair picked up Driscoll's father at his home and then drove to Jerry's Parkway tavern, where one Kathy Shaw joined them. From there, the foursome proceeded to dograces in Council Bluffs, Iowa. After watching about 10 races, during which time each of the parties drank some beer, the foursome left. It was about 10 p.m. Driscoll's father was dropped off at his residence. The remaining threesome, with Driscoll still driving, went to four different taverns. Everyone drank some beer at each tavern. The group, sometime after midnight, arrived back at Jerry's Parkway bar, the place of employment of Shaw. Upon entering the tavern, Driscoll stopped for a minute or two of small talk with the defendant, whom he knew and who was drinking beer at a table near the front of the tavern. Driscoll then joined McCarthy at the bar. Shaw had two beers and left in her own automobile, which had been left near the tavern earlier. Both Driscoll and McCarthy drank some beer.

At about 12:50 a.m., Patrick Pecha, a drinking companion

of Costanzo's, left the tavern to lie down in the defendant's truck. The truck was parked directly in front of the tavern. Costanzo thought Pecha had gone to the cab of the truck. As it turned out, Pecha lay down in the bed of the truck box. At 1 a.m., the bartender, Tama Goodall, gave a "last call." Shortly after that, McCarthy asked to purchase another beer, but was refused because his request came too late. Following some innocuous small talk, Costanzo passed some beer, in a pitcher, down the bar to McCarthy.

Driscoll and McCarthy drank some beer from defendant's pitcher. They then walked out of the tavern, with McCarthy following Driscoll. Near Costanzo's truck, Driscoll mentioned to McCarthy that he had seen a head sticking up from the bed of the truck and remarked to McCarthy that "somebody bit the dust." It was Pecha. McCarthy walked over and glanced into the truck bed. Driscoll testified he heard a door "slam open," looked back, and saw Costanzo running from the bar toward McCarthy. Because it appeared that the defendant was going to attack McCarthy, Driscoll yelled: "No, Ricky, don't." The defendant denied hearing the admonition.

Driscoll testified that McCarthy made a quarter turn, and as he did so, Costanzo struck him. Driscoll testified that McCarthy said nothing and never raised his fist to Costanzo. The defendant claimed Driscoll's position did not permit him to see McCarthy's hands or arms. Driscoll did not think that McCarthy ever saw the defendant at the truck. Driscoll testified that the defendant swung his right fist and hit McCarthy on the left jaw. McCarthy went down on his back. His head struck the sidewalk. McCarthy was unconscious, and there was no response. Costanzo went back into the bar.

Costanzo gave this version of the incident: As he was returning to his table from the tavern's restroom, Costanzo looked through a glass door and saw someone leaning into the back of his truck. The individual had his hands in the back of Costanzo's truck, where tools were kept. The defendant walked out onto the sidewalk in front of the tavern, saw Driscoll, and exchanged remarks with McCarthy. As the defendant approached the back of his truck, McCarthy spun around with his fist in the air to hit the defendant. "[S]o I swung at him and

hit him one time" on the jaw, Costanzo testified. The defendant saw McCarthy fall down and told Driscoll that McCarthy would be all right. Then defendant walked back into the tavern, where he drank more beer. On direct examination, the defendant testified he was not sure if he tried to hit McCarthy with all of the force he had available to him and with all the strength he had in his right arm. The defendant acknowledged that he intentionally hit McCarthy, but claimed that it was in self-defense. It is inherent in the guilty verdict that the jury did not accept Costanzo's self-defense claim.

Driscoll testified that after the incident, he went back into the tavern and asked the defendant: "Ricky, what did you do that for? He didn't do anything to you." Costanzo replied: "That will teach him to mouth off in the bar." Then Costanzo threatened Driscoll: "Hey, punk, shut up or you're next." Driscoll further testified that he asked someone to call an ambulance, whereupon the defendant declared: "He doesn't need an ambulance, he's all right; I didn't hit him that hard." Driscoll said he told the defendant: "Ricky, he [McCarthy] is unconscious and he is bleeding." Costanzo testified that Driscoll said of McCarthy: "He's not getting up and he's going into convulsions." It was disputed as to whether Driscoll or the defendant told someone to call 911 for an ambulance. It is not disputed that before the rescue squad arrived, the defendant picked up a six-pack of beer he had ordered earlier, left the tavern, and went to a party at a friend's house.

McCarthy was transported to University Hospital where he could be observed. When Driscoll went to pick up his friend the next morning, medical personnel were taking McCarthy into surgery to remove a blood clot.

Edward McCarthy's father, Dr. John McCarthy, testified that he had been licensed to practice medicine in Nebraska for the past 36 years, about his undergraduate and medical education, about being an Air Force medical officer, and about his return to family practice. Later, he took 3 years of postgraduate training in surgery and obstetrics in Omaha. Since then to time of trial, Dr. McCarthy had been in the private practice of medicine in Omaha. He had been an associate professor at University of Nebraska Medical Center and an

instructor at Creighton University college of medicine. This foundation qualified Dr. McCarthy as a medical expert.

Dr. McCarthy testified that his 33-year-old son, prior to July 13, 1986, lived alone, was in good health, was 5 feet 9 inches tall, and weighed less than 135 pounds. On cross-examination, Costanzo said that he, the defendant, was 6 feet 1 inch tall and weighed 200 pounds. Defendant was a heavy-construction cement worker and was in "pretty good physical shape." Costanzo further testified he had no reason to be afraid of Edward McCarthy.

Dr. McCarthy testified that he learned through a telephone call from University Hospital personnel at 5 a.m. on July 13, 1986, that his son had been injured, and about his son's condition. After discussing his son's case again with hospital personnel about 7:30 a.m. the same day, Dr. McCarthy instructed and authorized that neurosurgery be performed immediately.

Dr. McCarthy went to the hospital, where his son was undergoing neurosurgery. Dr. McCarthy, from July 13, 1986, to date of trial, continually consulted with the physicians treating his son and familiarized himself with everything that was done. Dr. McCarthy read all medical reports concerning his son. He read his son's CAT scan, which showed a large blood clot on his son's brain. Because Edward McCarthy was starting to have convulsions and was going into a coma, the blood clot had to be evacuated at once, according to Dr. McCarthy. He testified that the blood clot permanently blinded the younger McCarthy on the right side of each eye. As a result, Dr. McCarthy had observed, his son staggers to the right and runs into things on the right side because he is not able to see them. The doctor testified that his son had two jaw fractures which were consistent with being hit on the left side of the head. Dr. McCarthy further testified that because of severe trauma, his son nearly died. Due to the extreme risk of death to his son, the doctor called a priest who, at the doctor's request, administered the last rites sacrament to Edward McCarthy.

Dr. McCarthy stated that his son was in University Hospital for a month, during which time the son was in a coma. When young McCarthy began coming out of the coma, he was

transferred to Immanuel Medical Center for rehabilitative purposes. At that time, his right side, including his right leg and right arm, were paralyzed. Young McCarthy was hospitalized at Immanuel until late September. From that time to time of trial, Edward McCarthy lived with his father and took an anticonvulsive medicine. Because of his brain injury, young McCarthy has memory problems and other mental disabilities and cannot handle his own affairs, according to Dr. McCarthy. The father was appointed by a court as legal guardian of Edward McCarthy.

Edward McCarthy testified that he could remember everything that occurred on July 12, 1986, and the early morning of July 13, to the time he looked into the back of Costanzo's truck. Edward McCarthy further testified that he was unable to do the work he used to do; that he could not drive a car, ride a bicycle, or run. He testified, "I can't hardly even walk."

On cross-examination, the victim testified that he had had 8 or 10 beers the evening before and the morning he was hit. He testified that at the time of the incident he was probably happy, but not drunk.

Two witnesses were called in defendant's behalf: Tama Goodall, the bartender at Jerry's Parkway bar; and the defendant. Both the bartender and the defendant testified that Costanzo was not drunk the evening of July 12 or early morning hours of July 13. Goodall related that both Driscoll and Edward McCarthy were drunk, but not so drunk as to prevent her from serving them three more beers. The defendant testified that both Driscoll and McCarthy were drunk. Both defense witnesses corroborated witnesses for the State that the defendant had given young McCarthy and Driscoll some beer in a pitcher after "last call." Both defense witnesses said that it was the defendant who asked that an ambulance be called. Goodall verified that Driscoll had come back into the bar and told the defendant that "[y]ou shouldn't have hit him."

Costanzo admits that he hit young McCarthy and McCarthy immediately dropped to the sidewalk. The defendant does not argue that McCarthy's injuries are not serious as defined by Neb. Rev. Stat. § 28-109(20) (Reissue 1985), which provides:

"Serious bodily injury shall mean bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body."

Rather, defendant argues that the testimony of Dr. McCarthy is "totally incompetent to establish that the punch thrown by the defendant was the proximate cause of any permanent disability . . . ." Brief for Appellant at 8. Costanzo is apparently contending that his single punch to the victim could not cause the extensive injuries McCarthy suffered and that if it could, a causal nexus must be established by expert medical testimony. It is true that Dr. McCarthy was not asked whether his son's brain injury was a direct and proximate result of Costanzo's blow to the jaw. But expert testimony is not necessarily required to prove a causal relationship. " '[W]here the injuries are objective and the conclusion to be drawn from proved basic facts does not require special technical knowledge or science, the use of expert testimony is not legally necessary.' " *State v. Thomas*, 210 Neb. 298, 300-01, 314 N.W.2d 15, 18 (1981), quoting *Eiting v. Godding*, 191 Neb. 88, 214 N.W.2d 241 (1974).

From circumstantial evidence there can be no question but that Costanzo's punch knocked young McCarthy down and that the victim's head hit the sidewalk. The evidence is undisputed that young McCarthy had no physical or mental disabilities before the punch. From either the medical or the objective evidence concerning physical and mental disabilities of young McCarthy after Costanzo's blow, the jury, composed of lay people, could infer beyond a reasonable doubt that the defendant's blow proximately caused serious bodily injury to Edward McCarthy. Expert testimony of causal nexus was not required.

Costanzo also argues that there was insufficient evidence of his intent to inflict serious bodily injury. As we have consistently held: " '[T]he law is settled that independent evidence of specific intent is not required. The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.' " *State v. Tweedy*,

224 Neb. 715, 720, 400 N.W.2d 865, 869 (1987), quoting *State v. Thielen*, 216 Neb. 119, 342 N.W.2d 186 (1983); *State v. Ristau*, 201 Neb. 784, 272 N.W.2d 274 (1978).

Section 28-308 requires that Costanzo inflicted Edward McCarthy's injuries intentionally or knowingly. Costanzo claims he did not intend to inflict serious bodily injury upon Edward McCarthy.

There is a wealth of facts from which the jury could determine Costanzo's state of mind at the time he threw his punch at the victim. The defendant admitted he knowingly hit McCarthy. Costanzo knew that McCarthy hit his head on the sidewalk, was unconscious, and was bleeding from the left ear, and Costanzo did little or nothing about it. When Driscoll made inquiry as to why the defendant had hit McCarthy, Costanzo replied: "That will teach him to mouth off in the bar," and "Hey, punk, shut up or you're next." The jury could also take into consideration the circumstantial evidence as to the force of the blow and the varying sizes and weights of the victim and defendant. With the knowledge that McCarthy was knocked to the sidewalk and that McCarthy was unconscious, was bleeding from his left ear, and was having convulsions, Costanzo picked up a six-pack of beer, left the scene before the rescue squad arrived, and went to a party. The jury obviously did not accept the defendant's testimony that McCarthy regained consciousness before Costanzo left the scene.

Whether Costanzo had the intent or knowledge required by § 28-308 was for the jury. There was sufficient circumstantial evidence for the jury to find beyond a reasonable doubt that the defendant did have the intent required by § 28-308. As we held in *State v. Pence, ante* p. 201, 202, 416 N.W.2d 581, 582 (1987), "Intent may be inferred from the words or acts of the defendant and from the circumstances surrounding the incident." See, also, *State v. Schott*, 222 Neb. 456, 384 N.W.2d 620 (1986). This the jury did, in Costanzo's case.

Costanzo also complains that the trial court failed to give defendant's requested instruction No. 1, which, in part, stated that "excessive intoxication by which a person is wholly deprived of reason may prevent [a defendant from] having the intent charged." While there is evidence in the record showing

that the defendant had been drinking beer up until the time young McCarthy was injured, there was no evidence that Costanzo was intoxicated. All of the evidence, including defendant's own testimony and that of the bartender called by the defendant, was that Costanzo was not intoxicated. There was no evidence to the contrary. The trial court properly denied the requested instruction, since there was no evidence to support it. *State v. Clayburn*, 223 Neb. 333, 389 N.W.2d 314 (1986); *State v. Menser*, 222 Neb. 36, 382 N.W.2d 18 (1986).

In his brief, defendant claims that the trial court erroneously used the words "deadly force" in instructions Nos. 7 and 10. The words do not appear in instruction No. 7. Defendant's brief also refers to instruction No. 20. The instructions end with No. 15. Instruction No. 10 concerns the doctrine of "justification," commonly called "self-defense."

Costanzo at trial contended that his acts were justified because he used only such force which he believed to be necessary to protect himself. He claims he believed he was threatened with being attacked by Edward McCarthy. There was evidence from which a jury could properly infer that the blow inflicted by Costanzo was the proximate cause of the victim's being placed in extreme danger of death. So extreme was that danger that a priest was called to administer last rites to Edward McCarthy. The defendant further claimed he had no intent to cause serious bodily injury to his victim. From the evidence, a jury could conclude that without medical intervention, Edward McCarthy would have died. "Deadly force," as used in the instruction, was defined as that "force which a person uses with the purpose of causing, or which the person knows creates a substantial risk of causing, death or serious bodily harm." "Serious bodily injury" involves "a substantial risk of death, or . . . substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body." § 28-109(20).

If the jury found that "deadly force" was used by Costanzo, it would then have to determine whether that type of force was necessary, i.e., Did the defendant believe that such force was necessary to protect himself against death or serious bodily harm? If the jury found that Costanzo did not so believe, then

the defense of justification was not available to the defendant. The jury could then conclude that because of the amount of force used, the defendant had the intent to cause the risk of death or serious bodily injury. "Unlawful force," as used in the instruction, was defined as a wrongful act or attempt to inflict bodily injury upon another. It says nothing about "serious bodily injury" or "causing substantial risk of death." To determine whether the defendant, Costanzo, acted with justification or had the required intent for assault in the first degree, the jury necessarily had to determine the force of the blow the defendant administered. Taken as a whole, instruction No. 10 was a correct statement of the law and provided proper guidelines for that determination. See Neb. Rev. Stat. §§ 28-1406 to 28-1416 (Reissue 1985). It was the duty of the trial court to instruct as to the law of the case, and it did so. *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983). Defendant's claimed error is not supported by the record.

Costanzo contends that the trial court should have sua sponte given a lesser-included offense instruction. The answer to that contention is found in *State v. Pribil*, 224 Neb. 28, 395 N.W.2d 543 (1986). *Pribil* stands for the proposition that a court sua sponte *may* give a lesser-included offense instruction, but it is not required to do so unless the evidence warrants it and a party requests it.

For his third assignment of error, Costanzo claims he had ineffective assistance of counsel during his trial.

To be successful in this claim, Costanzo must prove (1) that his attorney failed to perform as well as an attorney with ordinary training and skill in the criminal law in the area; (2) that his interests were not conscientiously protected; and (3) that if his attorney had been effective, there is a reasonable probability that the results would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Jackson*, 226 Neb. 857, 415 N.W.2d 465 (1987); *State v. Falkner*, 218 Neb. 896, 360 N.W.2d 482 (1984). This standard applies whether the claim is made in a postconviction relief proceeding (*Jackson*) or as a part of a direct appeal (*Falkner*).

Defendant claims that his trial counsel failed to object to an

unendorsed witness' testifying, failed to cross-examine that witness, and failed to request a lesser-included offense instruction. In this assignment of error, Costanzo is referring to Edward McCarthy's father, who is a medical doctor.

The transcript reflects that prior to the jury's being impaneled, the court gave the State leave to endorse Dr. John McCarthy's name as a witness on the information. The defense, therefore, had the opportunity to question the jurors as to whether anyone knew the witness. It should not have come as a surprise to the defendant that medical evidence would be adduced. The State had previously endorsed the names of three University of Nebraska doctors as witnesses.

By detailed questioning, Dr. McCarthy was qualified as a medical expert. The evidence further shows that from the time he was first called about his son's injuries, Dr. McCarthy was involved medically in his son's treatment. When he was first contacted, Dr. McCarthy was told that his son was hospitalized for observation, that some blood work had been done on him, and that x rays were being taken. Dr. McCarthy asked to be notified when the hospital personnel had something definite to report. When contacted a second time, it was Dr. McCarthy who instructed hospital personnel to proceed with neurosurgery immediately. Dr. McCarthy consulted with the physicians involved in working with his son and diagnosing his injuries from the hospitalization to the time of trial. He testified that he was familiar with everything they did and the reports they wrote. Based upon his education, background, familiarity with the case, and his own observations, Dr. McCarthy was qualified to testify as an expert as to his son's condition. Defendant also complains that his trial counsel did not cross-examine Dr. McCarthy. Defendant never contested the seriousness of young McCarthy's injuries.

Costanzo at trial relied upon his own lack of intent and the self-defense doctrine to acquit him. Those two theories have nothing to do with Dr. McCarthy's testimony. Cross-examination might well have served only to underscore the parts of the doctor's testimony most damaging to the defendant. Because the prosecutor did not question Dr. McCarthy as to the proximate cause of his son's injuries,

prudent trial strategy might well have dictated that no cross-examination of the doctor should be undertaken. On cross-examination or redirect examination, Dr. McCarthy might well have given a medical opinion that would totally destroy Costanzo's claim of no nexus between his blow and young McCarthy's injuries. Apparently, the defense was not willing to take that gamble.

Costanzo further assigns as error his trial attorney's failure to request a lesser-included offense instruction. In his testimony, defendant claimed he was acting in self-defense. By requesting an intoxication instruction, it can be deduced that trial counsel was also relying upon lack of intent, to acquit the defendant. Arguments of counsel are not included in the record, and it may be that defense counsel, as did appellate counsel, argued a lack of nexus between defendant's blow and young McCarthy's injuries. All three of these defenses are all-or-nothing defenses.

Considering the strength of all the admissible and credible evidence in this case, we find the defendant failed to prove to a reasonable probability that the jury would have brought in a verdict other than guilty of assault in the first degree even if a lesser-included offense instruction had been given. Defendant's third assignment of error is without merit.

In his last assignment of error, Costanzo complains that the indeterminate sentence of 5 to 10 years' imprisonment imposed upon him is excessive. Under § 28-308, assault in the first degree is a Class III felony. Neb. Rev. Stat. § 28-105 (Reissue 1985) fixes the penalty for a Class III felony offense, which is not more than 20 years' imprisonment, or up to a $25,000 fine, or both, with a minimum of 1 year's imprisonment.

The presentence investigation reflects that Costanzo, who was age 27 at time of sentencing, had an extensive criminal record dating back to 1973. That record includes two felonies: (1) a burglary, for which he was placed on probation for 3 years and with a condition of probation that he spend 90 days in jail, and (2) robbery, for which he was sentenced to an indeterminate term of not less than 5 nor more than 7 years in the Nebraska Penal and Correctional Complex.

This court has repeatedly held that a sentence imposed within

the limits prescribed by the statute in question will not be disturbed on appeal, in the absence of an abuse of discretion. *State v. Perdue,* 222 Neb. 679, 386 N.W.2d 14 (1986); *State v. Turner,* 221 Neb. 852, 381 N.W.2d 149 (1986); *State v. Sianouthai,* 225 Neb. 62, 402 N.W.2d 316 (1987); *State v. Schreck,* 226 Neb. 172, 409 N.W.2d 624 (1987). Costanzo's sentence was well within the statutory range of penalties permitted. Considering Costanzo's prior criminal record and the seriousness of the offense involved in this case, we cannot say that the trial court abused its discretion in sentencing the defendant.

The conviction and sentence are affirmed.

AFFIRMED.