STATE OF NEBRASKA, APPELLEE, V. MARVEL JONES, APPELLANT.

432 N.W.2d 523

Filed December 2, 1988.    No. 87-1008.

Paul M. Conley for appellant.

Robert M. Spire, Attorney General, and Yvonne E. Gates for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Following a jury trial, defendant-appellant, Marvel Jones, was adjudged guilty of robbery in violation of Neb. Rev. Stat. § 28-324(1) (Reissue 1985), and sentenced to imprisonment for a period of 8 to 15 years. Jones' five assignments of error can be summarized as claiming that the district court erred in (1) finding the evidence sufficient to sustain the conviction, (2) failing to find Jones had been denied the effective assistance of

counsel at trial, and (3) pronouncing an excessive sentence. We affirm.

Immediately before the opening of the evidentiary portion of Jones' trial to the jury, his court-appointed trial attorney asked the court to allow Jones to address the court directly, outside the presence of the jury. The court granted this request, whereupon Jones said: "I tried to get hold of my attorney all this time, and I never got hold to [sic] him. I have called from the jail, and I have called, and I have — I just could never get no, you know, I could never contact him." The trial attorney stated that he had met with Jones or communicated with him by letter on 10 separate occasions prior to trial but had received no phone messages from him. The district court refused to appoint substitute counsel for Jones but did offer to allow Jones to proceed pro se. Jones declined the offer, and the case proceeded to trial with the aforesaid court-appointed trial attorney representing Jones.

The evidence revealed that on April 3, 1987, Dan Terhune was working the midnight to 8 a.m. shift at the Kwik Shop located at 3301 Holdrege Street in Lincoln and was the only employee on duty at that time. At about 2 a.m., a man ran into the store wearing a hat, gloves, and mask, and carrying a gun. The gunman approached Terhune, pointed the gun at his chest, and demanded money. Terhune put food stamps, cash, coins, and receipts from his cash register into a paper sack carried into the store by the gunman. The food stamps were in a bundle that Terhune had assembled and marked earlier in the evening; the receipts were internal bookkeeping documents that bore, among other identifying marks, the Kwik Shop's store number. The cash amounted to about $120, mostly in bills smaller than $10, and some change. The gunman took the sack and left the store, heading south, and Terhune called the police.

Terhune described the gunman as wearing a light-colored "sailor's hat" with the brim pulled down, a white mask similar to a race car driver's balaclava, a light-colored jacket, brown gloves with light-colored fur lining, and blue jeans. In his left hand, he was carrying a large, silver-gray gun, which resembled an automatic weapon rather than a revolver. According to Terhune, the gunman was approximately 5 feet 8 inches tall,

weighed about 155 to 160 pounds, and was slight of build. Although Terhune could not see the gunman's face or skin, he, based on the man's speech patterns, thought it likely the gunman was black.

Lincoln Police Department Investigator G. Jeff Gade was near the intersection of 27th and Vine Streets in an unmarked police cruiser at 2:11 on the morning of the robbery. After learning of the robbery via police radio, Gade stopped his cruiser on Vine Street between 27th and 28th and waited. About a minute later, Gade observed a vehicle stop on the north side of Vine Street at 30th and remain stationary at a stop sign for almost 30 seconds. As there was no other traffic on Vine Street at this time, Gade's suspicions were aroused, and as the other vehicle began to move, Gade maneuvered his cruiser so as to arrive at 30th Street at the same time as the other vehicle.

Gade observed that the vehicle was a brown Chevrolet Caprice four-door with a tan vinyl top and that there were two people inside, both in the front seat, the driver being a black female and the passenger a black male. Gade followed the vehicle south on 30th Street for 5 to 7 minutes as it slowly meandered through a residential neighborhood there. During this time, Gade observed the driver of the vehicle commit several traffic infractions.

After a time, a marked police cruiser, answering Gade's radio call for assistance, pulled between Gade's unmarked cruiser and the suspect vehicle. As the marked cruiser drew closer, the suspect vehicle slowed to about 5 miles per hour and pulled slightly to the right; at 3123 R Street, the passenger jumped out and ran off. Gade, 25 to 35 feet back in his cruiser, saw this person in his headlights as he ran off. He described the individual as "a black male approximately five six to five eight, 140 pounds, slender build, medium-length Afro hair, wearing a tan or light-colored jacket or shirt which was not tucked in, a pair of dark-colored pants and dark shoes." Gade immediately stopped his cruiser and gave chase on foot, but lost sight of the suspect in an alley nearby.

In the meantime, Scott Beggs, the police officer who had joined Gade in pursuit of the Chevrolet, stopped the automobile on 31st Street between R and S Streets. Inside,

Beggs found Gloria Patterson, the driver, and took her into custody.

Patterson testified at Jones' trial under grant of use immunity pursuant to Neb. Rev. Stat. § 29-2011.02 (Reissue 1985). According to Patterson, Jones was in her vehicle, a brown Chevrolet Impala with white vinyl top, on the morning of the robbery. At that time, Jones was wearing a light-colored shirt and white hat. At Jones' request, at 1:30 or 2 a.m., Patterson drove him to the Kwik Shop at 33d and Holdrege Streets. Jones left the vehicle, ran into the store, came out a short time later, and ran away toward 34th Street. Patterson drove off, but moments later came upon Jones and let him back into the vehicle. At this time, Patterson saw that Jones carried a sack and a gun.

Patterson drove to near 33d and Vine Streets, where another vehicle began following hers. Jones told Patterson to "lose him," and Patterson "turned a few corners" but was unable to shake the vehicle following them, at which point Jones informed Patterson that he would jump out of her vehicle, which he did. Patterson was then stopped, and subsequently told police officers that Jones had been her passenger and where he lived.

Lincoln Police Officer Paul Aksamit, a dog handler, was called in with his police dog to track the suspect. In an alley at 2800 P Street, a black male carrying a brown paper sack ran toward Aksamit. Aksamit ordered the individual to stop, and took him into custody. In court, Aksamit identified Jones as the person he took into custody that evening. Although at the time of his arrest the temperature was about 40 degrees and there was patchy snow on the ground, Jones was wearing dark-colored pants and no shirt, and was in stocking feet.

Several items were found on the ground near Jones when he was taken into custody, including the gun, the gloves, and the paper sack admitted into evidence at trial. The sack was found to contain $125 in cash and coins, $17 in food stamps, and two Kwik Shop receipts. After daybreak, the area where Jones had been captured was searched, resulting in the discovery of several items of clothing behind a nearby air-conditioner. These items of clothing were also admitted into evidence at trial. At

the time of his arrest, Jones lived about one block from where the items of clothing were found; the clothing was located about two blocks from where the arrest took place.

At trial, Terhune identified the hat, mask, jacket, and gloves received in evidence as identical to the items worn by the gunman, and the gun, apparently a BB or pellet gun, and paper sack received in evidence as identical to those carried by the gunman. Terhune also recognized the bundle of food stamps and receipts received in evidence as those taken by the gunman.

At the close of the State's case, Jones, through his trial attorney, moved for dismissal, a motion which the court overruled. Jones, again through his trial attorney, subsequently rested without calling any witnesses and moved for a directed verdict, which motion was also overruled.

In his first assignment of error, Jones urges upon this court the view that the evidence is not sufficient to sustain his conviction. It is well established that in determining the sufficiency of the evidence to sustain a criminal conviction, it is not the province of the Supreme Court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact, and the verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Trevino, ante* p. 494, 432 N.W.2d 503 (1988); *State v. Berkman, ante* p. 163, 430 N.W.2d 310 (1988); *State v. McDonald, ante* p. 85, 430 N.W.2d 282 (1988); *State v. Anderson,* 229 Neb. 427, 427 N.W.2d 764 (1988).

Section 28-324(1) defines the crime in question as follows: "A person commits robbery if, with the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever."

Circumstantial evidence is sufficient to support a conviction if such evidence and the reasonable inferences that may be drawn therefrom establish guilt beyond a reasonable doubt. In a criminal case established by circumstantial evidence, the State is not required to disprove every hypothesis but that of guilt. *State v. McDonald, supra.* As the foregoing recitation of the

record demonstrates, the evidence fully supports the jury's finding that Jones, with the intent to steal, took money or other personal property of value from the person of Terhune by putting Terhune in fear. Jones' first assignment of error is clearly without merit.

In his second summarized assignment of error, Jones asserts he was denied his right, under the sixth amendment to the U.S. Constitution, to the effective assistance of counsel at trial. We have said that in order to assert a successful claim of ineffective assistance of counsel, a defendant must prove (1) that his or her attorney failed to perform as well as an attorney with ordinary training and skill in the criminal law in the area, (2) that defendant's interests were not conscientiously protected, and (3) that if the attorney had been effective, there is a reasonable probability the results would have been different. E.g., *State v. Reddick, ante* p. 218, 430 N.W.2d 542 (1988); *State v. Harton, ante* p. 167, 430 N.W.2d 313 (1988); *State v. Painter,* 229 Neb. 278, 426 N.W.2d 513 (1988); *State v. Costanzo*, 227 Neb. 616, 419 N.W.2d 156 (1988); *State v. Juhl*, 218 Neb. 792, 359 N.W.2d 109 (1984). In reality, however, a showing that a defendant's interests were not conscientiously protected is subsumed in a showing that the attorney failed to perform as well as an attorney with ordinary training and skill in the criminal law in the area. Thus, to sustain a claim of ineffective assistance of counsel as a violation of the sixth amendment to the U.S. Constitution and thereby obtain reversal of a defendant's conviction, the defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defense, that is, a demonstration of reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Hawthorne, ante* p. 343, 431 N.W.2d 630 (1988); *State v. Evans,* 218 Neb. 849, 359 N.W.2d 790 (1984). See, also, *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Regarding the first component of this test, Jones makes essentially three arguments. The first is that his trial attorney did not thoroughly question the State's witnesses and failed to present any defense witnesses. Apart from speculating that the

trial attorney might have succeeded in confusing Terhune on the stand, Jones himself fails to bring to this court's attention the nature of any favorable testimony which might have been elicited from any of the State's witnesses or from anyone else; a sober reading of the record suggests that the trial attorney labored under the same handicap. See, *State v. Costanzo, supra*; *State v. Pribil*, 227 Neb. 397, 417 N.W.2d 786 (1988); *State v. Broomhall*, 227 Neb. 341, 417 N.W.2d 349 (1988).

Jones next contends that the trial attorney should have objected to the court's statement at the conclusion of Terhune's testimony that he might be called again and thus should "keep a number with the County Attorney's office where *we* can get hold of you." (Emphasis supplied.)

In Jones' view,

> The inference is that the prosecution and the judiciary are combined and that the State's witness was also the Court's witness. Had Marvel Jones been represented by defense counsel who was actively participating in the trial, a motion for mistrial or a cautionary admonition should have come forth to protect Defendant's right to a fair and impartial trial.

Brief for appellant at 11. The interpretation Jones places on the statement is a strained one; in the context made, the statement is more reasonably interpreted as meaning that Terhune should keep the county attorney's office, which called him as a witness, advised as to his whereabouts so that anyone connected with the trial could reach him if desired.

Thus, whether to interpose an objection of the sort suggested by Jones to the questioned comment is one of trial strategy; accordingly, the failure to have made such an objection will not support an inference of ineffective assistance of counsel. See, *State v. Costanzo, supra*; *State v. Meis*, 223 Neb. 935, 395 N.W.2d 509 (1986); *State v. Jackson*, 226 Neb. 857, 415 N.W.2d 465 (1987).

Lastly, Jones argues that the fact a second charge, that of using a firearm in the commission of a felony, was voluntarily dismissed by the State rather than upon motion of his trial attorney somehow proves that his trial attorney was ineffective. Again, it is a matter of trial strategy whether to move to dismiss

a charge the State apparently could not have proved because of the nature of the device used to put Terhune in fear. The trial attorney may well have thought Jones' interests would have been better served had the court dismissed that charge at the close of the State's evidence for a failure of proof.

Thus, Jones has failed to satisfy the first component of the test in this court of ineffective assistance of counsel. That being so, we must conclude that Jones' second summarized assignment of error is, for that reason alone, without merit.

Finally, Jones urges upon us the view that the sentence pronounced by the district court was excessive. A sentence imposed within the limits prescribed by statute will not be set aside as excessive absent an abuse of discretion on the part of the sentencing judge. *State v. Berkman, ante* p. 163, 430 N.W.2d 310 (1988); *State v. Thomas,* 229 Neb. 635, 428 N.W.2d 221 (1988).

Robbery is a Class II felony. § 28-324. Neb. Rev. Stat. § 28-105 (Reissue 1985) provides that the penalty for a Class II felony shall be "Maximum-fifty years imprisonment Minimum-one year imprisonment." The sentence meted out to Jones is within the limits prescribed by statute, and we find no basis on which we can say the district court abused its discretion. Thus, Jones' third assignment of error is also without merit.

AFFIRMED.

FAHRNBRUCH, J., not participating.